## BLOOMER *vs.* BLOOMER.

### *In the matter of the Estate of* THOMAS BLOOMER, *deceased.*

THE will of the decedent having been proven in the county of New York, and letters testamentary issued; on the final accounting of the executrix, it appearing that the testator, at the time of his death, was domiciled in the State of Connecticut,—*Held*, that the law of the domicil governs as to the question of testacy or intestacy, in respect to personal estate; and the proper tribunal of the domicil having adjudged the will revoked by the subsequent birth of a child to the deceased, it was incumbent upon this court to hold the will invalid as a will of personalty.

The invalidity of a will as to personalty does not, of necessity, render it invalid as to realty, as real estate is governed by the *lex loci*. The will in question being valid as to real estate in New York, and containing a direction for the sale of the real estate, and the distribution of the proceeds,—under which direction the lands were sold,—*Held*, that the Surrogate had jurisdiction to order distribution. *Held*, also, that the personalty was distributable, as in case of intestacy, according to the laws of Connecticut; and that the disposition of the proceeds of the realty must be regulated by the laws of New York, which give to a post-testamentary child the same portion as would have descended had the parent died intestate.

The whole real and personal estate having, by the terms of the will, been thrown into one fund, applicable to the discharge of the various bequests; and two legatees having, in consequence of the revocation of the will as to the personal estate, been left to the proceeds of the real estate alone for payment,—*Held*, that the other legatees, who were next of kin, should be put to their election to take under the will or against it.

As a general rule, the competency of evidence is governed by the *lex fori*, and not the *lex domicilii*.

By the civil law, the birth of a child, which the testator did not foresee, revoked the whole testament, but did not revoke a codicil, where there was no testament.

By the common law, the birth of a child, in connection with other circumstances, might be sufficient to establish an implied revocation. This rule has been adopted in this country, either to the extent of revoking the will entirely, or *pro tanto*, so as to let in the children born after the making of the will.

Whether, at common law, a will of personalty, not disposing of the whole estate, would be revoked by the birth of a child, and an alteration of circumstances,— *Quære ?*

Whether, at common law, a *donatio causâ mortis*, not disposing of the whole estate, would be revoked by the birth of a child,— *Quære ?*

Gifts *causâ mortis* are of a mixed nature, resembling gifts *inter vivos*, in the essential requisite of delivery, and resembling legacies in being subject to the debts of the deceased, and in being ambulatory or revocable, and contingent on death.

By the law of Connecticut a will, whether making a total or partial disposition, is revoked by the subsequent birth of a child, if no provision has been made in the instrument for that contingency; and where a will would be revoked by such a circumstance,—*Held*, that a *donatio causâ mortis* would likewise be revoked.

An executrix, after letters issued and before the will was adjudged to have been revoked, having, under the testamentary directions, paid out of the personal estate a mortgage on the realty,—*Held*, that having acted in good faith, the payment must be allowed, leaving the legatees and next of kin to their claim against the land for the sum so paid.

CHARLES JUDSON, *for Executrix.*

I. A *nuncupative* will, at common law, was a full right to will all personal property without writing.

The statute law of England, and of many of the United States, has abridged and restricted the right. (4 *Kent Com.* 517. 1 *R. L.*, 1813, *p.* 367, *sec.* 14.) The Revised Statutes, except in case of soldiers and seamen (2 *R. S., p.* 60, *sec.* 22), make such a will void.

Mr. Minor testified that, at common law, such a will was good in Connecticut, if made in the last illness and in view of approaching death.

Upon the law as proved, and upon Mr. Minor's testimony, the gift of the $2,300 is a valid will.

II. The proceeds of the real estate in the city of New York, are not real estate. As to personal estate, there is no will. The proceeds must, of necessity, be treated as real estate. What was personal when Mr. Bloomer died, must be divided by the laws of Connecticut. As to the

real estate and the power of sale, the will is good, no matter where made or where Mr. Bloomer died. He died intestate as to his personal property, but not as to his real estate in this State.

This court must enforce the will in this State, as far as it is a will. If, by the laws of another State, a part of the property is detached and taken away, that does not vitiate the will as to real estate here.

The investment of $9,500 should be made.

III. Mrs. Bloomer, the executrix, is to be protected for all her acts until she was ousted as executrix. (2 *R. S.*, *p.* 79, *sec.* 47.)

Under the will she would be entitled, for the support of herself and family, to the income on $31,000, exclusive of the house in Connecticut.

She has maintained all the children except two ; and as to Mrs. Way and Thomas, payments were made on account of their supposed legacies.

IV. As to the household furniture, Mr. Minor's evidence is that, by the Connecticut law, she is entitled to it.

V. She is of course entitled to one-third part of all personal property of which she is not entitled to the whole.

VI. Mrs. Bloomer is entitled to be allowed one-third of the $3,110 paid to take up the Connecticut mortgage. (1 *R. S.*, *p.* 749, *sec.* 4.)

She is also entitled to be allowed one-third of the amount she expended on the Connecticut house.

E. H. Owen *and* John E. Burrill, *for Legatees and Next of Kin.*

The Surrogate. The will of the deceased was proved before me, and letters testamentary were granted to his

widow, the executrix. It now appears that the testator was domiciled, at the time of his death, at Greenwich, in the State of Connecticut; and by the law of that State, when, after the death of the testator, he shall have a child born for whom no provision has been made in the will, the will is revoked. There is no doubt that, in regard to personalty, the law of the domicil of the deceased governs as to the question of testacy or intestacy, and the distribution of the estate. (*Story's Conflict of Laws*, § 473). Mr. Bloomer's will has been declared void by the proper probate judge in Connecticut, in consequence of the birth of a posthumous child, and letters of administration were granted to his widow. The great bulk of the property of the deceased, was, at the time of his death, in the State of New York; and now, on the accounting of the executrix before me, several interesting points require to be settled.

1. The invalidity of the instrument as a will of personal estate by the law of the testator's domicil, does not of necessity render it invalid as a will of real estate. Real estate is governed by the *lex loci*. But whenever, for any reason, a portion of a will fails, it may become a question whether the general scheme and plan of the instrument viewed as a whole, have been so deranged—whether the purpose and intention of the testator have been so materially defeated—as to render the entire disposition invalid. This is a question of construction respecting the realty which does not fall within my jurisdiction, unless under the clause of the will which *directs* the real estate to be sold and the proceeds invested for the benefit of legatees. The will being valid as to that power, and the power having been exercised, and the real estate having been converted into personalty, it only remains for the Surrogate to direct the distribution of the estate. The personal estate will, of course, be divided as in case of intestacy, according to the laws of Connecticut; one-third to the widow, and the remainder equally among all the

children. As to the disposition of the proceeds of the real estate situate in New York, that must be regulated by our law, which gives to a post-testamentary child the same portion as would have descended if the father had died intestate. (2 *R. S., p.* 65, § 49 ; *Mitchell* vs. *Blain*, 5 *Paige*, 588.) So far, there seems no difficulty. But the will throws the whole real and personal estate into one fund, applicable to the discharge of the various bequests ; and as there are two legatees who, in consequence of the revocation of the will as to personalty by the laws of Connecticut, are left to the proceeds of the real estate alone for payment, I think the other legatees who are next of kin, should be put to their election. (*Hawley* vs. *James*, 16 *Wendell*, 142 ; *and cases cited*, 1 *Jarman*, 385.) If they claim under the will, it will stand entire, except as to the interest of the posthumous child ; if they claim against the will, the two legatees who are not related to the deceased will take under the will, and the proceeds of the real estate will be sufficient to discharge their legacies.

2. The widow of the deceased claims that her husband, in view of his approaching death, gave her the sum of two thousand three hundred dollars. She produces no evidence of this, except her own deposition, voluntarily made, and not called for by the other parties. It appears, that by the laws of Connecticut, such evidence is competent.— (*Revised Statutes of Conn.*, 1849, *p.* 86, § 141). But as a general rule, the competency of evidence depends upon the *lex fori*, and not upon the *lex domicilii ;* and although great effort has been made to give a larger latitude to the law of the domicil, I am not aware that courts have gone so far as to allow the law of the domicil to regulate the question whether or not a witness is competent to testify. (*Story's Conflict of Laws*, § 630, b). Independently of this difficulty, I think the validity of the gift as an effectual donation, supposing it well established by the proofs, depends upon another point. The birth of the testator's

posthumous child, by the law of Connecticut, revoked his will. This rule was adopted from the civil law. The power of disposing of property by will, as originally established by Solon, at Athens, was limited to the case where the testator had no children; and as this law was transferred by the Decemviri to Rome, the authority of the parent to give his estate and disinherit his issue, was also greatly restrained. It is somewhat curious to trace the influence of these early principles, through the current of the civil law as adopted and recognized in the various countries of Europe. It was the peculiar office of the Roman testament, to institute an heir; and the person so instituted, took the heritage as heir and not as purchaser. Children might be exheredated by testament, if a just cause, such as ingratitude, were assigned in the instrument; and the *querela inofficiosi testamenti,* was an action allowed in favor of children for rescinding testaments made to their prejudice, in which no cause or an unjust cause of exheredation was assigned. The birth of a child which the testator did not foresee, revoked the whole testament (*Dig., Lib.,* 28 *Tit.,* 3, § 3), as well the legacies, as the institution of an heir; for, as justly observed by Domat, " if the testator had foreseen the birth of this child, he would have burdened the succession with fewer legacies, or perhaps would have left none at all." (*Domat,* § 3132). For the same reason, the birth of a child revoked a codicil, where there was both a testament and a codicil; and yet it seems that when there was only a codicil and not a testament, the birth of a child did not annul it, because dying without a testament, the deceased intended to leave his succession to his heir-at-law, whoever he might be, burdened with the codicil. Domat questions the equity of this rule, instancing, as illustrative of its injustice, the case of an unmarried man making a codicil disposing of the greatest part of his estate, and willing to leave the small remainder to a collateral heir, and afterwards marrying,

having children, and dying without revoking the codicil, either through forgetfulness or because surprised by death.

On examining how far these doctrines of implied revocation were recognized in England, we find that the ecclesiastical courts very early adopted the rule that marriage and the birth of a child revoked a will of personalty; and the same principle was ultimately, but not without a struggle, applied to devises of real estate. Finally, it was held that it was not necessary that a subsequent marriage and birth of a child, should both concur, but that the birth of a child alone, in connection with other circumstances, might be sufficient to raise an implied revocation. (*Johnston* vs. *Johnston*, 1 *Phill.*, 447 ; *Marston* vs. *Fox*, 8 *Ad. & E.*, 14.) There is so much sound wisdom and natural equity in this conclusion, that it has been received very generally, and with various modifications been adopted in the statutes of nearly all the States, either to the extent of revoking the will entirely, or *pro tanto*, so as to let in the children born after the will was made.

Lord Mansfield (*Kenebel* vs. *Scrafton*, 2 *East.*, 541 ; *Brady* vs. *Cubitt*, *Doug.*, 31) ; and Lord Ellenborough considered the revocation as operating only when there was a total disposition of the estate ; the nomination of an executor being taken, in analogy to the Roman law, as constituting such a total disposition so far as relates to personalty. But a will disposing only of personalty, and leaving the real estate to descend to the heir-at-law, would be revoked by marriage and the birth of children ; and a will giving a few legacies, appointing an executor, and leaving the bulk of the personalty undisposed of, would also be revoked by the same events ; and yet in each case there would be property descending to the heir or next of kin, as in case of intestacy. The rule originally prevailed in the ecclesiastical courts, by adopting the doctrine of the civil law, that the institution of an heir or executor was a total disposition ; but as the executor is now bound to distribute

the residue remaining after the payment of debts and legacies, among the widow and next of kin, a will appointing an executor does not in reality dispose of the whole estate ; and yet such a will would be revoked by marriage and the birth of children, according to the common-law rule. A will containing partial dispositions, therefore, may be revoked by such circumstances, provided an executor be nominated. May it not be justly asked, then, whether the question of revocation must depend upon a rule now entirely artificial—upon a mere form which has been stripped of its original quality, the total disposition of the estate, and now has no other force than to constitute a trustee for the benefit of those entitled to the succession ?

There might be cases where so small a portion of the estate was *disposed* of by legacy or devise, that it would be unreasonable to imply an intention to revoke in case of the subsequent birth of children ; and again, there may be cases where the whole estate is so nearly, but not entirely, given away, that the implication of intention to revoke in case of the birth of children, would be very strong. This question might become important under the laws of this State, which have let in a posthumous child to a share of the parent's estate, whether the disposition by will was partial or total; but not having subjected a *donatio causâ mortis* to the operation of the same provision, a man might marry, have no children, and make large dispositions by gifts *causâ mortis,* perhaps exhausting his property, and yet a posthumous child be without remedy, unless on the doctrine of an implied revocation.

Gifts *causâ mortis* are of a mixed nature : they partake of the character of gifts *inter vivos,* from delivery, which is essential to their validity ; and yet this single feature, assimilating them to ordinary donations, merely characterizes the mode of the thing, and not its type and quality.— Though in form they are gifts,—so in fact are legacies ; the difference being that in the former case there

must be delivery, and though the gift may be resumed by the donor taking possession, it cannot be revoked by a will, but is claimed against, and not through, the executor or administrator. The truth is, a will under our laws, is substantially a *donatio mortis causâ*, that is, a gift to take effect on death, the donation being completed by the act of the executor or administrator. A real *donatio causâ mortis* is made, by the donor being his own executor. There is no difference in the *nature* of these things, but only in the incidents flowing from the method of giving title. A *donatio mortis causâ* has the substantial qualities of a legacy in being ambulatory or revocable. Its completion is conditioned or contingent upon death. It may be reclaimed or revoked during the donor's life. It is subject to the debts of the deceased, and, in England, has been declared by statute to be liable to legacy duties. (*Bunn* vs. *Markham*, 7 *Taunt.*, 231 ; *Drury* vs. *Smith*, 1 *P. Wms.*, 406 ; 2 *Vesey, Sen.*, 434 ; *Tate* vs. *Hilbert*, 2 *Vesey, Jun.*, 120.) In one of the earliest cases, Lord Cowper, in defining this gift, says, if the donor " dies, it shall operate as a legacy." (*Hedges* vs. *Hedges, Prec. Ch.*, 269.) By the civil law, if the donee died before the donor, the gift lapsed (*Inst., Lib.* 2, *Tit.* 7, § 1). Before the time of Justinian, there was some doubt as to the true character of these donations, some classing them with last wills and legacies, others with donations *inter vivos ;* and to resolve this, it was determined they should be treated as legacies. *Hæ mortis causâ donationes ad exemplum legatorum redactæ sunt per omnia.* (*Inst., Lib.* 2, *Tit.* 7, § 1 ; *Cod., Lib.* 8, *Tit.* 57, § 4). It also appears that by the civil law, donations *inter vivos* were revoked if the donor had no children, and happened to have children born to him afterwards. (*Cod., Lib.* 8, *Tit.* 56, § 8 ; *Domat,* § 8 ; 2 *Burge, Com.*, 147.) By the French code, ordinary donations are absolutely revoked by the birth of children. (2 *Burge*, 205.) In the State of Connecticut, by the law of which State this ques-

tion must be determined, the statute has adopted the broad rule, that "a will" is revoked by the birth of a child if no provision is made in the will for that contingency. It is not necessary that the will shall dispose of the whole estate. All wills are revoked by the birth of a child —all legacies—all testamentary dispositions, total or partial. (*Revised Statutes of Connecticut*, 1849, *Title* xiv, *Ch.* 1, § 6.) Having recognized this rule in relation to written bequests, the same principle may justly be applied to donations *causâ mortis*, a form of gift in view of death, by no means of so solemn and deliberate a character as a will.— In the nature and reason of things, there seems no substantial ground for not applying the same principle to unwritten as to written legacies, so far as relates to an implied revocation by the birth of a child. Having attained the point that by the law of the testator's domicil, a total disposition is not essential for the application of the doctrine of implied revocation, there is nothing in the way of applying that rule alike to gifts in view of death, by parole and delivery, or by written instrument. I am of opinion, therefore, that the claim made on the ground of this alleged *donatio mortis causâ*, should be rejected.

It appears that, before the will was denied probate in the State of Connecticut, the executrix, acting under the directions contained in the will, paid out of the personal estate, a mortgage on some lands at Greenwich. This payment having been made in good faith (2 *R. S.*, *p.* 63, § 38, *p.* 78, § 46, *p.* 79 § 47), must be allowed, and the legatees and next of kin will have their claim against the land, for the sum so paid.